(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH ET AL. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 09–837. Argued November 8, 2010—Decided January 11, 2011

Petitioners (hereinafter Mayo) offer residency programs to doctors who have graduated from medical school and seek additional instruction in a chosen specialty. Those programs train doctors primarily through hands-on experience. Although residents are required to take part in formal educational activities, these doctors generally spend the bulk of their time—typically 50 to 80 hours a week—caring for patients. Mayo pays its residents annual "stipends" of over $40,000 and also provides them with health insurance, malpractice insurance, and paid vacation time.

The Federal Insurance Contributions Act (FICA) requires employees and employers to pay taxes on all "wages" employees receive, 26 U. S. C. §§3101(a), 3111(a), and defines "wages" to include "all remuneration for employment," §3121(a). FICA defines "employment" as "any service . . . performed . . . by an employee for the person employing him," §3121(b), but excludes from taxation any "service performed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at [the school]," §3121(b)(10). Since 1951, the Treasury Department has construed the student exception to exempt from taxation students who work for their schools "as an incident to and for the purpose of pursuing a course of study." 16 Fed. Reg. 12474. In 2004, the Department issued regulations providing that "[t]he services of a full-time employee"—which includes an employee normally scheduled to work 40 hours or more per week—"are not incident to and for the purpose of pursuing a course of study." 26 CFR §31.3121(b)(10)–2(d)(3)(iii). The Department explained that this analysis "is not affected by the fact that the services . . . may have an educational, in-

structional, or training aspect." *Ibid.* The rule offers as an example a medical resident whose normal schedule requires him to perform services 40 or more hours per week, and concludes that the resident is not a student.

Mayo filed suit asserting that this rule was invalid, and the District Court agreed. It found the full-time employee rule inconsistent with §3121's unambiguous text and concluded that the factors governing this Court's analysis in *National Muffler Dealers Assn., Inc.* v. *United States*, 440 U. S. 472, also indicated that the rule was invalid. The Eighth Circuit reversed. Applying *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, the Court of Appeals concluded that the Department's regulation was a permissible interpretation of an ambiguous statute.

*Held:* The Treasury Department's full-time employee rule is a reasonable construction of §3121(b)(10). Pp. 6–15.

(a) Under *Chevron*'s two-part framework, the Court first asks whether Congress has "directly addressed the precise question at issue." 467 U. S., at 842-843. Congress has not done so here; the statute does not define "student" or otherwise attend to the question whether medical residents are subject to FICA. Pp. 6–7.

(b) The parties debate whether the Court should next apply *Chevron* step two or the multi-factor analysis used to review a tax regulation in *National Muffler*. Absent a justification to do so, this Court is not inclined to apply a less deferential framework to evaluate Treasury Department regulations than it uses to review rules adopted by any other agency. The Court has "[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action." *Dickinson* v. *Zurko*, 527 U. S. 150, 154. And the principles underlying *Chevron* apply with full force in the tax context. *Chevron* recognized that an agency's power "'to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left . . . by Congress.'" 467 U. S., at 843. Filling gaps in the Internal Revenue Code plainly requires the Treasury Department to make interpretive choices for statutory implementation at least as complex as the ones made by other agencies in administering their statutes.

It is true that the full-time employee rule, like the rule at issue in *National Muffler,* was promulgated under the Department's general authority to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U. S. C. §7805(a). It is also true that this Court, in opinions predating *Chevron,* stated that it owed less deference to a rule adopted under that general grant of authority than it would afford rules issued pursuant to more specific grants. See *Rowan Cos.* v. *United States*, 452 U. S. 247, 253; *United*

Syllabus

*States* v. *Vogel Fertilizer Co.*, 455 U. S. 16, 24. Since then*,* however, the Court has found *Chevron* deference appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States* v. *Mead Corp.*, 533 U. S. 218, 226–227. *Chevron* and *Mead* provide the appropriate framework for evaluating the full-time employee rule. The Department issued the rule pursuant to an explicit authorization to prescribe needful rules and regulations, and only after notice-and-comment procedures. The Court has recognized these to be good indicators of a rule meriting *Chevron* deference, *Mead*, 533 U. S., at 229–231. Pp. 7–12.

  (c) The rule easily satisfies *Chevron*'s second step. Mayo accepts the Treasury Department's determination that an individual may not qualify for the student exception unless the educational aspect of his relationship with his employer predominates over the service aspect of that relationship, but objects to the Department's conclusion that residents working more than 40 hours per week categorically cannot satisfy that requirement. Mayo argues that the Treasury Department should be required to engage in a case-by-case inquiry into what each employee does and why he does it, and that the Department has arbitrarily distinguished between hands-on training and classroom instruction. But regulation, like legislation, often requires drawing lines. The Department reasonably sought to distinguish between workers who study and students who work. Focusing on the hours spent working and those spent in studies is a sensible way to accomplish that goal. The Department thus has drawn a distinction between education and service, not between classroom instruction and hands-on training. The Treasury Department also reasonably concluded that its full-time employee rule would "improve administrability," 69 Fed. Reg. 76405, and thereby "has avoided the wasteful litigation and continuing uncertainty that would inevitably accompany [a] case-by-case approach" like the one Mayo advocates, *United States* v. *Correll*, 389 U. S. 299, 302. Moreover, the rule reasonably takes into account the Social Security Administration's concern that exempting residents from FICA would deprive them and their families of vital social security disability and survivorship benefits. Pp. 12–15.

568 F. 3d 675, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which all other Members joined, except KAGAN, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–837

## MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, ET AL., PETITIONERS *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[January 11, 2011]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Nearly all Americans who work for wages pay taxes on those wages under the Federal Insurance Contributions Act (FICA), which Congress enacted to collect funds for Social Security. The question presented in this case is whether doctors who serve as medical residents are properly viewed as "student[s]" whose service Congress has exempted from FICA taxes under 26 U. S. C. §3121(b)(10).

I

A

Most doctors who graduate from medical school in the United States pursue additional education in a specialty to become board certified to practice in that field. Petitioners Mayo Foundation for Medical Education and Research, Mayo Clinic, and the Regents of the University of Minnesota (collectively Mayo) offer medical residency programs that provide such instruction. Mayo's residency programs, which usually last three to five years, train doctors primarily through hands-on experience. Residents often

spend between 50 and 80 hours a week caring for patients, typically examining and diagnosing them, prescribing medication, recommending plans of care, and performing certain procedures. Residents are generally supervised in this work by more senior residents and by faculty members known as attending physicians. In 2005, Mayo paid its residents annual "stipends" ranging between $41,000 and $56,000 and provided them with health insurance, malpractice insurance, and paid vacation time.

Mayo residents also take part in "a formal and structured educational program." Brief for Petitioners 5 (internal quotation marks omitted). Residents are assigned textbooks and journal articles to read and are expected to attend weekly lectures and other conferences. Residents also take written exams and are evaluated by the attending faculty physicians. But the parties do not dispute that the bulk of residents' time is spent caring for patients.

B

Through the Social Security Act and related legislation, Congress has created a comprehensive national insurance system that provides benefits for retired workers, disabled workers, unemployed workers, and their families. See *United States* v. *Lee*, 455 U. S. 252, 254, 258, and nn. 1, 7 (1982). Congress funds Social Security by taxing both employers and employees under FICA on the wages employees earn. See 26 U. S. C. §3101(a) (tax on employees); §3111(a) (tax on employers). Congress has defined "wages" broadly, to encompass "all remuneration for employment." §3121(a) (2006 ed. and Supp. III). The term "employment" has a similarly broad reach, extending to "any service, of whatever nature, performed . . . by an employee for the person employing him." §3121(b).

Congress has, however, exempted certain categories of service and individuals from FICA's demands. As relevant here, Congress has excluded from taxation "service per-

formed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university." §3121(b)(10) (2006 ed.). The Social Security Act, which governs workers' eligibility for benefits, contains a corresponding student exception materially identical to §3121(b)(10). 42 U. S. C. §410(a)(10).

Since 1951, the Treasury Department has applied the student exception to exempt from taxation students who work for their schools "as an incident to and for the purpose of pursuing a course of study" there. 16 Fed. Reg. 12474 (adopting Treas. Regs. 127, §408.219(c)); see Treas. Reg. §31.3121(b)(10)–2(d), 26 CFR §31.3121(b)(10)–2(d) (2010). Until 2005, the Department determined whether an individual's work was "incident to" his studies by performing a case-by-case analysis. The primary considerations in that analysis were the number of hours worked and the course load taken. See, *e.g.,* Rev. Rul. 78–17, 1978–1 Cum. Bull. 307 (services of individual "employed on a full-time basis" with a part-time course load are "not incident to and for the purpose of pursuing a course of study").

For its part, the Social Security Administration (SSA) also articulated in its regulations a case-by-case approach to the corresponding student exception in the Social Security Act. See 20 CFR §404.1028(c) (1998). The SSA has, however, "always held that resident physicians are not students." SSR 78–3, 1978 Cum. Bull. 55–56. In 1998, the Court of Appeals for the Eighth Circuit held that the SSA could not categorically exclude residents from student status, given that its regulations provided for a case-by-case approach. See *Minnesota* v. *Apfel,* 151 F. 3d 742, 747–748. Following that decision, the Internal Revenue Service received more than 7,000 claims seeking FICA tax refunds on the ground that medical residents qualified as students under §3121(b)(10) of the Internal Revenue Code.

568 F. 3d 675, 677 (CA8 2009).

Facing that flood of claims, the Treasury Department "determined that it [wa]s necessary to provide additional clarification of the ter[m]" "student" as used in §3121(b)(10), particularly with respect to individuals who perform "services that are in the nature of on the job training." 69 Fed. Reg. 8605 (2004). The Department proposed an amended rule for comment and held a public hearing on it. See *id.*, at 76405.

On December 21, 2004, the Department adopted an amended rule prescribing that an employee's service is "incident" to his studies only when "[t]he educational aspect of the relationship between the employer and the employee, as compared to the service aspect of the relationship, [is] predominant." *Id.*, at 76408; Treas. Reg. §31.3121(b)(10)–2(d)(3)(i), 26 CFR §31.3121(b)(10)–2(d)(3)(i) (2005). The rule categorically provides that "[t]he services of a full-time employee"—as defined by the employer's policies, but in any event including any employee normally scheduled to work 40 hours or more per week—"are not incident to and for the purpose of pursuing a course of study." 69 Fed. Reg. 76408; Treas. Reg. §31.3121(b)(10)–2(d)(3)(iii), 26 CFR §31.3121(b)(10)–2(d)(3)(iii) (the full-time employee rule). The amended provision clarifies that the Department's analysis "is not affected by the fact that the services performed . . . may have an educational, instructional, or training aspect." *Ibid.* The rule also includes as an example the case of "Employee E," who is employed by "University V" as a medical resident. 69 Fed. Reg. 76409; Treas. Reg. §31.3121(b)(10)–2(e), 26 CFR §31.3121(b)(10)–2(e) (Example 4). Because Employee E's "normal work schedule calls for [him] to perform services 40 or more hours per week," the rule provides that his service is "not incident to and for the purpose of pursuing a course of study," and he accordingly is not an exempt "student" under §3121(b)(10). 69

Fed. Reg. 76409, 76410; Treas. Reg. §31.3121(b)(10)–2(e), 26 CFR §31.3121(b)(10)–2(e) (Example 4).

## C

After the Department promulgated the full-time employee rule, Mayo filed suit seeking a refund of the money it had withheld and paid on its residents' stipends during the second quarter of 2005. 503 F. Supp. 2d 1164, 1166–1167 (Minn. 2007); *Regents of Univ. of Minn.* v. *United States*, No. 06–5084 (D Minn., Apr. 1, 2008), App. to Pet. for Cert. C–47a. Mayo asserted that its residents were exempt under §3121(b)(10) and that the Treasury Department's full-time employee rule was invalid.

The District Court granted Mayo's motion for summary judgment. The court held that the full-time employee rule is inconsistent with the unambiguous text of §3121, which the court understood to dictate that "an employee is a 'student' so long as the educational aspect of his service predominates over the service aspect of the relationship with his employer." 503 F. Supp. 2d, at 1175. The court also determined that the factors governing this Court's analysis of regulations set forth in *National Muffler Dealers Assn., Inc.* v. *United States*, 440 U. S. 472 (1979), "indicate that the full-time employee exception is invalid." 503 F. Supp. 2d, at 1176; see App. to Pet. for Cert. C–54a.

The Government appealed, and the Court of Appeals reversed. 568 F. 3d 675. Applying our opinion in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), the Court of Appeals concluded that "the statute is silent or ambiguous on the question whether a medical resident working for the school full-time is a 'student'" for purposes of §3121(b)(10), and that the Department's amended regulation "is a permissible interpretation of the statut[e]." 568 F. 3d, at 679–680, 683.

We granted Mayo's petition for certiorari. 560 U. S. \_\_\_

(2010).

## II
## A

We begin our analysis with the first step of the two-part framework announced in *Chevron, supra,* at 842–843, and ask whether Congress has "directly addressed the precise question at issue." We agree with the Court of Appeals that Congress has not done so. The statute does not define the term "student," and does not otherwise attend to the precise question whether medical residents are subject to FICA. See 26 U. S. C. §3121(b)(10).

Mayo nonetheless contends that the Treasury Department's full-time employee rule must be rejected under *Chevron* step one. Mayo argues that the dictionary definition of "student"—one "who engages in 'study' by applying the mind 'to the acquisition of learning, whether by means of books, observation, or experiment'"—plainly encompasses residents. Brief for Petitioners 22 (quoting Oxford Universal Dictionary 2049–2050 (3d ed. 1955)). And, Mayo adds, residents are not excluded from that category by the only limitation on students Congress has imposed under the statute—that they "be 'enrolled and regularly attending classes at [a] school.'" Brief for Petitioners 22 (quoting 26 U. S. C. §3121(b)(10)).

Mayo's reading does not eliminate the statute's ambiguity as applied to working professionals. In its reply brief, Mayo acknowledges that a full-time professor taking evening classes—a person who presumably would satisfy the statute's class-enrollment requirement and apply his mind to learning—could be excluded from the exemption and taxed because he is not "'predominant[ly]'" a student. Reply Brief for Petitioners 7. Medical residents might likewise be excluded on the same basis; the statute itself does not resolve the ambiguity.

The District Court interpreted §3121(b)(10) as unambig-

uously foreclosing the Department's rule by mandating that an employee be deemed "a 'student' so long as the educational aspect of his service predominates over the service aspect of the relationship with his employer." 503 F. Supp. 2d, at 1175. We do not think it possible to glean so much from the little that §3121 provides. In any event, the statutory text still would offer no insight into how Congress intended predominance to be determined or whether Congress thought that medical residents would satisfy the requirement.

To the extent Congress has specifically addressed medical residents in §3121, moreover, it has expressly excluded these doctors from exemptions they might otherwise invoke. See 26 U. S. C. §§3121(b)(6)(B), (7)(C)(ii) (excluding medical residents from exemptions available to employees of the District of Columbia and the United States). That choice casts doubt on any claim that Congress specifically intended to insulate medical residents from FICA's reach in the first place.

In sum, neither the plain text of the statute nor the District Court's interpretation of the exemption "speak[s] with the precision necessary to say definitively whether [the statute] applies to" medical residents. *United States* v. *Eurodif S. A.*, 555 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 13).

B

In the typical case, such an ambiguity would lead us inexorably to *Chevron* step two, under which we may not disturb an agency rule unless it is "'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Household Credit Services, Inc.* v. *Pfennig*, 541 U. S. 232, 242 (2004) (quoting *United States* v. *Mead Corp.*, 533 U. S. 218, 227 (2001)). In this case, however, the parties disagree over the proper framework for evaluating an ambiguous provision of the Internal Revenue Code.

Mayo asks us to apply the multi-factor analysis we used

to review a tax regulation in *National Muffler*, 440 U. S.
472. There we explained:

> "A regulation may have particular force if it is a sub-
> stantially contemporaneous construction of the stat-
> ute by those presumed to have been aware of congres-
> sional intent. If the regulation dates from a later
> period, the manner in which it evolved merits inquiry.
> Other relevant considerations are the length of time
> the regulation has been in effect, the reliance placed
> on it, the consistency of the Commissioner's interpre-
> tation, and the degree of scrutiny Congress has
> devoted to the regulation during subsequent re-
> enactments of the statute." *Id.,* at 477.

The Government, on the other hand, contends that the
*National Muffler* standard has been superseded by *Chev-
ron*. The sole question for the Court at step two under the
*Chevron* analysis is "whether the agency's answer is based
on a permissible construction of the statute." 467 U. S., at
843.

Since deciding *Chevron*, we have cited both *National
Muffler* and *Chevron* in our review of Treasury Depart-
ment regulations. See, *e.g., United States* v. *Cleveland
Indians Baseball Co.*, 532 U. S. 200, 219 (2001) (citing
*National Muffler*); *Cottage Savings Assn.* v. *Commissioner*,
499 U. S. 554, 560–561 (1991) (same); *United States* v.
*Boyle*, 469 U. S. 241, 246, n. 4 (1985) (citing *Chevron*); see
also *Atlantic Mut. Ins. Co.* v. *Commissioner*, 523 U. S. 382,
387, 389 (1998) (citing *Chevron* and *Cottage Savings*).

Although we have not thus far distinguished between
*National Muffler* and *Chevron*, they call for different
analyses of an ambiguous statute. Under *National Muf-
fler*, for example, a court might view an agency's interpre-
tation of a statute with heightened skepticism when it has
not been consistent over time, when it was promulgated
years after the relevant statute was enacted, or because of

the way in which the regulation evolved. 440 U. S., at 477. The District Court in this case cited each of these factors in rejecting the Treasury Department's rule, noting in particular that the regulation had been promulgated after an adverse judicial decision. See 503 F. Supp. 2d, at 1176; see also Brief for Petitioners 41–44 (relying on the same considerations).

Under *Chevron*, in contrast, deference to an agency's interpretation of an ambiguous statute does not turn on such considerations. We have repeatedly held that "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 981 (2005); accord, *Eurodif S. A.*, *supra,* at \_\_\_ (slip op., at 10). We have instructed that "neither antiquity nor contemporaneity with [a] statute is a condition of [a regulation's] validity." *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 740 (1996). And we have found it immaterial to our analysis that a "regulation was prompted by litigation." *Id.,* at 741. Indeed, in *United Dominion Industries, Inc.* v. *United States*, 532 U. S. 822, 838 (2001), we expressly invited the Treasury Department to "amend its regulations" if troubled by the consequences of our resolution of the case.

Aside from our past citation of *National Muffler*, Mayo has not advanced any justification for applying a less deferential standard of review to Treasury Department regulations than we apply to the rules of any other agency. In the absence of such justification, we are not inclined to carve out an approach to administrative review good for tax law only. To the contrary, we have expressly "[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action." *Dickinson* v. *Zurko*, 527 U. S. 150, 154 (1999). See, *e.g., Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212, 222–

223 (1989) (declining to apply "a different and stricter
nondelegation doctrine in cases where Congress delegates
discretionary authority to the Executive under its taxing
power").

The principles underlying our decision in *Chevron* apply
with full force in the tax context. *Chevron* recognized that
"[t]he power of an administrative agency to administer a
congressionally created . . . program necessarily requires
the formulation of policy and the making of rules to fill
any gap left, implicitly or explicitly, by Congress." 467
U. S., at 843 (internal quotation marks omitted). It ac-
knowledged that the formulation of that policy might
require "more than ordinary knowledge respecting the
matters subjected to agency regulations." *Id.,* at 844
(internal quotation marks omitted). Filling gaps in the
Internal Revenue Code plainly requires the Treasury
Department to make interpretive choices for statutory
implementation at least as complex as the ones other
agencies must make in administering their statutes. Cf.
*Bob Jones Univ.* v. *United States*, 461 U. S. 574, 596
(1983) ("[I]n an area as complex as the tax system, the
agency Congress vests with administrative responsibility
must be able to exercise its authority to meet changing
conditions and new problems"). We see no reason why our
review of tax regulations should not be guided by agency
expertise pursuant to *Chevron* to the same extent as our
review of other regulations.

As one of Mayo's *amici* points out, however, both the
full-time employee rule and the rule at issue in *National
Muffler* were promulgated pursuant to the Treasury De-
partment's general authority under 26 U. S. C. §7805(a) to
"prescribe all needful rules and regulations for the en-
forcement" of the Internal Revenue Code. See Brief for
Carlton M. Smith 4–7. In two decisions predating *Chev-
ron*, this Court stated that "we owe the [Treasury Depart-
ment's] interpretation less deference" when it is contained

in a rule adopted under that "general authority" than when it is "issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos.* v. *United States*, 452 U. S. 247, 253 (1981); *United States* v. *Vogel Fertilizer Co.*, 455 U. S. 16, 24 (1982) (quoting *Rowan*).

Since *Rowan* and *Vogel* were decided, however, the administrative landscape has changed significantly. We have held that *Chevron* deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U. S., at 226–227. Our inquiry in that regard does not turn on whether Congress's delegation of authority was general or specific. For example, in *National Cable & Telecommunications Assn.*, *supra,* we held that the Federal Communications Commission was delegated "the authority to promulgate binding legal rules" entitled to *Chevron* deference under statutes that gave the Commission "the authority to 'execute and enforce,'" and "to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of," the Communications Act of 1934. 545 U. S.*,* at 980–981 (quoting 47 U. S. C. §§151, 201(b)). See also *Sullivan* v. *Everhart*, 494 U. S. 83, 87, 88–89 (1990) (applying *Chevron* deference to rule promulgated pursuant to delegation of "general authority to 'make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions'" (quoting 42 U. S. C. §405(a) (1982 ed.))).

We believe *Chevron* and *Mead*, rather than *National Muffler* and *Rowan*, provide the appropriate framework for evaluating the full-time employee rule. The Department issued the full-time employee rule pursuant to the explicit authorization to "prescribe all needful rules and

regulations for the enforcement" of the Internal Revenue
Code. 26 U. S. C. §7805(a). We have found such "express
congressional authorizations to engage in the process of
rulemaking" to be "a very good indicator of delegation
meriting *Chevron* treatment." *Mead, supra,* at 229. The
Department issued the full-time employee rule only after
notice-and-comment procedures, 69 Fed. Reg. 76405, again
a consideration identified in our precedents as a "signifi-
cant" sign that a rule merits *Chevron* deference. *Mead,
supra,* at 230–231; see, *e.g., Long Island Care at Home,
Ltd.* v. *Coke,* 551 U. S. 158, 173–174 (2007).

We have explained that "the ultimate question is
whether Congress would have intended, and expected,
courts to treat [the regulation] as within, or outside, its
delegation to the agency of 'gap-filling' authority." *Id.,* at
173 (emphasis deleted). In the *Long Island Care* case, we
found that *Chevron* provided the appropriate standard of
review "[w]here an agency rule sets forth important indi-
vidual rights and duties, where the agency focuses fully
and directly upon the issue, where the agency uses full
notice-and-comment procedures to promulgate a rule,
[and] where the resulting rule falls within the statutory
grant of authority." 551 U. S., at 173. These same consid-
erations point to the same result here. This case falls
squarely within the bounds of, and is properly analyzed
under, *Chevron* and *Mead.*

C

The full-time employee rule easily satisfies the second
step of *Chevron*, which asks whether the Department's
rule is a "reasonable interpretation" of the enacted text.
467 U. S., at 844. To begin, Mayo accepts that "the 'educa-
tional aspect of the relationship between the employer and
the employee, as compared to the service aspect of the
relationship, [must] be predominant'" in order for an
individual to qualify for the exemption. Reply Brief for

Petitioners 6–7 (quoting Treas. Reg. §31.3121(b)(10)–2(d)(3)(i), 26 CFR §31.3121(b)(10)–2(d)(3)(i)).  Mayo objects, however, to the Department's conclusion that residents who work more than 40 hours per week categorically cannot satisfy that requirement.  Because residents' employment is itself educational, Mayo argues, the hours a resident spends working make him "more of a student, not less of one."  Reply Brief for Petitioners 15, n. 3 (emphasis deleted).  Mayo contends that the Treasury Department should be required to engage in a case-by-case inquiry into "*what* [each] employee does [in his service] and *why*" he does it.  *Id.,* at 7.  Mayo also objects that the Department has drawn an arbitrary distinction between "hands-on training" and "classroom instruction."  Brief for Petitioners 35.

  We disagree.  Regulation, like legislation, often requires drawing lines.  Mayo does not dispute that the Treasury Department reasonably sought a way to distinguish between workers who study and students who work, see IRS Letter Ruling 9332005 (May 3, 1993).  Focusing on the hours an individual works and the hours he spends in studies is a perfectly sensible way of accomplishing that goal.  The Department explained that an individual's service and his "course of study are separate and distinct activities" in "the vast majority of cases," and reasoned that "[e]mployees who are working enough hours to be considered full-time employees . . . have filled the conventional measure of available time with work, and not study."  69 Fed. Reg. 8607.  The Department thus did not distinguish classroom education from clinical training but rather education from service.  The Department reasonably concluded that its full-time employee rule would "improve administrability," *id.*, at 76405, and it thereby "has avoided the wasteful litigation and continuing uncertainty that would inevitably accompany any purely case-by-case approach" like the one Mayo advocates, *United States* v.

*Correll*, 389 U. S. 299, 302 (1967).

As the Treasury Department has explained, moreover, the full-time employee rule has more to recommend it than administrative convenience. The Department reasonably determined that taxing residents under FICA would further the purpose of the Social Security Act and comport with this Court's precedent. As the Treasury Department appreciated, this Court has understood the terms of the Social Security Act to "'import a breadth of coverage,'" 69 Fed. Reg. 8605 (quoting *Social Security Bd.* v. *Nierotko*, 327 U. S. 358, 365 (1946)), and we have instructed that "exemptions from taxation are to be construed narrowly," *Bingler* v. *Johnson*, 394 U. S. 741, 752 (1969). Although Mayo contends that medical residents have not yet begun their "working lives" because they are not "fully trained," Reply Brief for Petitioners 13 (internal quotation marks omitted), the Department certainly did not act irrationally in concluding that these doctors—"who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees"—are the kind of workers that Congress intended to both contribute to and benefit from the Social Security system. 69 Fed. Reg. 8608.

The Department's rule takes into account the SSA's concern that exempting residents from FICA would deprive residents and their families of vital disability and survivorship benefits that Social Security provides. *Id.,* at 8605. Mayo wonders whether the full-time employee rule will result in residents being taxed under FICA but denied coverage by the SSA. The Government informs us, however, that the SSA continues to adhere to its longstanding position that medical residents are not students and thus remain eligible for coverage. Brief for United States 29–30; Tr. of Oral Arg. 33–34.

\*     \*     \*

We do not doubt that Mayo's residents are engaged in a valuable educational pursuit or that they are students of their craft. The question whether they are "students" for purposes of §3121, however, is a different matter. Because it is one to which Congress has not directly spoken, and because the Treasury Department's rule is a reasonable construction of what Congress has said, the judgment of the Court of Appeals must be affirmed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.